# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50918-1-II |
| Respondent, | |
| v. | |
| JOHN GRIFFIN HEADRICK, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. —John Headrick appeals from his first degree child molestation conviction and sentence, contending that (1) the trial court erred by denying his request to instruct the jury on fourth degree assault as a lesser included offense to first degree child molestation, (2) the State failed to present sufficient evidence in support of his conviction, and (3) the trial court abused its discretion by imposing a sentencing condition prohibiting contact with his daughter.  Headrick also requests that (4) we remand with instructions to strike a DNA (deoxyribonucleic acid) collection fee imposed as a legal financial obligation (LFO) in light of recent amendments to the LFO statutes.

In his statement of additional grounds (SAG) for review, Headrick contends that (5) the trial court violated his speedy trial right, (6) he was tried on a deficient charging document, (7) the State violated federal regulations and his constitutional rights by searching mail he had sent to his wife while housed in jail awaiting trial, (8) his defense counsel was ineffective for failing to investigate the State's search of mail he had sent from jail, (9) the State committed a discovery

violation, (10) his right to be present at every critical stage of trial was violated, and (11) there is an error on his judgment and sentence form.

Because the trial court abused its discretion by denying Headrick's request to instruct the jury on fourth degree assault as a lesser included offense to his first degree child molestation charge, we reverse his conviction and remand for a new trial.

## FACTS

Kelsey Badger-Dye is the mother of JL, who was born in April 2009. In 2016, Badger-Dye met John and Shannon Headrick[1] and their five-year-old daughter, EH. JL became friends with EH, and the children would often have playdates together. Headrick would usually accompany EH on the playdates.

Headrick and Badger-Dye arranged for JL to sleep over at the Headrick's home on December 16, 2016, when JL was seven years old. Badger-Dye drove JL to the Headrick's home. Shannon was at work from 4:00 p.m. to 12:30 a.m. The next day, Badger-Dye met Headrick, EH, and JL at a Walmart in Chehalis. JL "immediately came running to [Badger-Dye], grabbed onto [her] legs, [and] was begging [her] to go home." Report of Proceedings (RP) (July 11, 2017) at 14.

A few days later, Badger-Dye told JL that she had planned for her to have another sleepover at the Headrick's home. JL became "emotional and upset" and told Badger-Dye that she did not want to go to the Headrick's home. RP (July 11, 2017) at 16. JL then disclosed to

---

[1] Because John and Shannon Headrick share a last name, we hereafter refer to Shannon by her first name for clarity. We intend no disrespect.

Badger-Dye that Headrick had touched her inappropriately during the last sleepover. Badger-Dye reported the disclosure to the Grays Harbor Sheriff's Department the following day.

The Grays Harbor Sheriff's Department referred JL to advanced registered nurse practitioner Judith Presson for a sexual assault examination. During the examination, JL told Presson that Headrick had picked her up, carried her to his room, put her on his bed, and knelt on the floor next to the bed. JL told Presson that Headrick then pulled her pants down, touched her "peepee" with his hand, and put lotion on her body. RP at 108. JL further stated to Presson that Headrick did not say anything to her throughout the entire incident and that he stopped touching her after she told him to "stop it." RP at 110.

Detective Sergeant Darrin Wallace investigated JL's disclosure. Wallace placed a recorder on Badger-Dye and had her confront Headrick about JL's allegation. Headrick told Badger-Dye that JL was sick, so he examined her, put lotion on her, and checked her glands; Headrick denied touching JL in an inappropriate manner. Wallace later arrested Headrick and transported him to jail.

At the jail, Headrick told Wallace that JL had diarrhea while at a Burger King and upon returning home, he "gave her a bath and put lotion on her after the bath like he does with his daughter [EH] and checked her glands." RP (July 11, 2017) at 59. Headrick initially denied touching JL's vagina, but eventually stated to Wallace that "he may have accidently brushed across [JL]'s vagina while applying the lotion around the vagina." RP (July 11, 2017) at 60. On January 25, 2017, the State charged Headrick with first degree child molestation.

At trial, Badger-Dye, Wallace, and Presson testified consistently with the facts stated above. Additionally, Wallace testified that corrections deputies had viewed a letter sent by

Headrick to Shannon, which stated that he had put "lotion on [JL] as a preventative measure due to the diarrhea she was having, to prevent a rash from occurring." RP (July 11, 2017) at 65. The letter was admitted as evidence at trial over defense objection. Bager-Dye additionally testified that she did not have any contact with either Headrick or Shannon until it was almost time for JL to go home the next day and that Headrick did not tell her about JL being sick during the sleepover or that he had treated her for her sickness.

JL testified that she had been crying at the sleepover because EH did something mean, after which Headrick picked her up and carried her to his room. JL stated that Headrick then "laid me on his bed, pulled my pants down to my knees, took his finger, started picking at my peepee, and rubbed lotion on me." RP (July 11, 2017) at 30. When asked what part of her body she meant by "peepee," JL pointed to her crotch area. RP (July 11, 2017) at 31. JL described Headrick touching her with his hand on her skin. When asked whether he touched her on the outside or inside, JL said, "Inside." RP (July 11, 2017) at 32. JL stated that she had told Headrick to stop, after which she pulled up her pants, but that he again pulled her pants down and started rubbing lotion on her.

Forensic interviewer Samantha Mitchell testified that she had interviewed JL following a referral from the Grays Harbor Sheriff's Department. Regarding JL's disclosure, Mitchell stated:

> [JL] talked about being at her best friend [EH's] house and they were having a tea party in the garage and she had had—she started crying because [EH] had taken some of her food and [Headrick] had come in and picked her up and took—taken her to his bedroom where he went and got lotion and put it on her belly. She talked more about the incident in the bedroom and said that when he was carrying her there, she said she told him no.
>
> When I asked her what happened after she said no, she said nothing, they went into the bedroom. She talked about him putting her on the bed and going into the bathroom. She said that she tried to get up and leave, but he saw her and came out and told her no and put his hand—she touch—she pointed or put her hand on

4

her chest and pushed her back on the bed. She said that he took the lotion and put it on her belly.

And I asked her about how her clothes were. . . . [s]he said that her pants were pulled down to about her knees, and the same with her underwear, and that he put lotion on her peepee, and that her underwear were dirty because she had a poopy accident because they didn't have any toilet paper.

RP (July 12, 2017) at 131-32.

Headrick testified that JL was having an issue with diarrhea while at a Burger King with him and EH, and that he had discussed the issue with Badger-Dye via Facebook video chat. Headrick stated that Badger-Dye had offered to bring some medicine to the Burger King but that he told her he would stop at a store and pick up the medicine. Headrick also stated that he had asked Badger-Dye about JL having clean underwear and that she told him JL had packed two pairs of underwear.

Regarding JL's accusation, Headrick testified that he had heard JL crying and that he then mediated a dispute between her and EH. Headrick further testified:

After I calmed them down, I—[JL] kept pulling at herself, so I picked her up and carried her into the bedroom to check her out and put some barrier cream lotion on it. . . .
And I noticed she had some poo on her, so I took that off her, too, and then I applied the barrier cream lotion.

RP (July 12, 2017) at 164. Headrick stated that he also checked the glands around JL's neck to see if they were swollen and felt her head to see if she had a fever. Headrick said that he used the same barrier cream that was prescribed for his daughter. Headrick stated that he stopped treating JL after it appeared that she became uncomfortable. Headrick further stated that he did not knowingly touch JL's vagina. On cross-examination, Headrick testified that he had applied the barrier cream around but not on JL's vagina, and that he did not have permission from JL's parents to touch her or give her medicine.

5

Two witnesses who were in jail with Headrick also testified. Gregory Sanchez testified that he had been in custody in the jail cell across from Headrick. Sanchez stated that he had overheard Headrick tell his cell mate "about how he was putting cream or something on her," and was "playing with her bottom and playing with her . . . genitals" during "some kind of sleep over for his daughter." RP (July 11, 2017) at 80. When asked about what Headrick had specifically said about the cream, Sanchez testified that he had said something about not realizing that he had left marks on the girl and that he used the cream to cover up the marks. William Bryant testified that he had shared a jail cell with Headrick. Bryant stated that he never heard Headrick talk about molesting a girl.

At the close of the evidence, the trial court denied defense counsel's request for a lesser included jury instruction on fourth degree assault, and the following discussion took place:

> [Defense counsel]: If the jury were to believe that he engaged in a harmful or offensive touching, but that it was not sexually motivated, he would then be guilty of assault fourth and not a child molestation in the first degree. On that basis I'm entitled to the instruction, I take exception to you not giving it.
> . . . .
> [Trial court]: So I didn't see where the evidence established any harmful or offensive conduct other than child molestation in the first degree. And so that the only statements were that if—if a sexual organ was touched by Mr. Headrick, it was done inadvertently and not intentionally, therefore you don't have an intentional touch—touching or striking of another person that's harmful or offensive, so you have no evidence to support that.
> [Defense counsel]: Your Honor, if the evidence was believed that he touched her general pubic area without touching her vagina and that she found that offensive, that—that was—that statement was made by several witnesses. And he was adamant that he never touched her vagina in quite a bit of the evidence that we've seen here, that can still be harmful or offensive, but not a child molestation.
> [Trial court]: I don't see where—I heard his testimony. There's no—in no way did his testimony indicate anything that he did was harmful or offensive. He did it pursuant to instructions from a pediatrician, his parenting class, and in the same way that he would treat his own daughter, so there's no way that could be harmful or offensive. If it was, he would be assaulting his daughter. So, again, the

6

evidence doesn't establish—is sufficient to instruct the jury on assault in the fourth degree.

RP (July 12, 2017) at 174-76.

The jury returned a verdict finding Headrick guilty of first degree child molestation. At sentencing, the trial court found that Headrick was a persistent offender based on his previous multiple convictions of first degree child molestation and sentenced him to life without the possibility of early release. The trial court also imposed as a financial legal obligation a $100 DNA collection fee. Additionally, the trial court imposed a sentencing condition prohibiting Headrick from having any contact with juveniles under 18 years of age. The trial court explained to Headrick that this condition applied to his own daughter, EH. Headrick appeals from his conviction and sentence.

ANALYSIS

I. FOURTH DEGREE ASSAULT INSTRUCTION

Headrick contends that the trial court erred by refusing to instruct the jury on fourth degree assault as a lesser included offense to his first degree child molestation charge. We agree.

Where the evidence supports it, both the State and the defendant have a statutory right to present an instruction to the jury on lesser included offenses. *State v. Gamble*, 154 Wn.2d 457, 462, 114 P.3d 646 (2005). The failure of a trial court to give a lesser included instruction when the defendant is entitled to one is reversible error. *State v. Ginn*, 128 Wn. App. 872, 878, 117 P.3d 1155 (2005). We apply the *State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978) test to determine whether a defendant is entitled to a lesser included offense instruction. *State v. Porter*, 150 Wn.2d 732, 736, 82 P.3d 234 (2004).

A defendant is entitled to a lesser included offense instruction if the two prongs of the *Workman* test are met. 90 Wn.2d at 447. First, under the *Workman* test's legal prong, each element of the lesser included offense must be a necessary element of the charged offense. 90 Wn.2d at 447-48. Second, to meet the *Workman* test's factual prong, evidence presented in a case "must raise an inference that *only* the lesser included[] . . . offense was committed to the exclusion of the charged offense." *State v. Fernandez-Medina*, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000). When analyzing the factual prong, the trial court must view the evidence that purports to support a requested instruction in the light most favorable to the party who requested the instruction at trial, here Headrick. *Fernandez-Medina*, 141 Wn.2d at 455-56. "[T]he court must consider *all* of the presented evidence when deciding whether or not to give a lesser included instruction," and may be required to give the lesser included instruction even where the defendant's own testimony contradicts the evidence supporting the instruction. *State v. Stevens*, 158 Wn.2d 304, 311, 143 P.3d 817 (2006) (emphasis added).

The State concedes that *Workman*'s legal prong is met here. We accept the State's concession. *See Stevens*, 158 Wn.2d at 311 ("Second degree child molestation necessarily includes the elements of fourth degree assault.").[2] Where only the factual prong is in dispute, we review the trial court's determination for an abuse of discretion. *State v. LaPlant*, 157 Wn. App. 685, 687, 239 P.3d 366 (2010). A trial court abuses its discretion when its decision is manifestly

---

[2] The only element distinguishing first degree child molestation from second degree child molestation is the age of the victim and, thus, the *Stevens* Court's holding that "[s]econd degree child molestation necessarily includes the elements of fourth degree assault" applies equally to first degree child molestation. 158 Wn.2d at 311; *Compare* RCW 9A.44.083, *with* RCW 9A.44.086.

unreasonable or based on untenable grounds or reasons. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).

To determine whether the factual prong of the *Workman* test is satisfied, we analyze whether the evidence "'affirmatively establish[es] the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt.'" *Porter*, 150 Wn.2d at 737 (quoting *Fernandez-Medina*, 141 Wn.2d at 456). If the evidence would permit a jury to rationally find the defendant guilty of the lesser offense and acquit him of the greater offense, a lesser included instruction should be given. *State v. Berlin*, 133 Wn.2d 541, 551, 947 P.2d 700 (1997).

"Fourth degree assault" is defined as an assault not amounting to first, second, or third degree assault, or custodial assault. RCW 9A.36.041; *Stevens*, 158 Wn.2d at 310. Because the statute does not define "assault," we apply the following common law definitions: (1) an attempt, with unlawful force, to inflict bodily injury upon another; (2) an unlawful touching with criminal intent; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is incapable of inflicting that harm. *Stevens*, 158 Wn.2d at 310-11. Relevant here is the second definition of assault, an unlawful touching with criminal intent,[3] which "'[u]nlike other forms of assault, . . . does not require proof of specific intent to cause apprehension or inflict substantial bodily harm.'" *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (quoting *Stevens*, 158 Wn.2d at 314 (Madsen, J., dissenting)). "'Instead, assault by actual battery

---

[3] We do not decide whether fourth degree assault would meet the legal prong of the *Workman* test under either of the two remaining definitions because Headrick argues only that the evidence at trial would support the jury finding him guilty of fourth degree assault to the exclusion of first degree child molestation under the second definition.

is an intentional touching or striking of another person that is harmful or offensive, regardless whether it results in any physical injury.'" *Cardenas-Flores*, 189 Wn.2d at 266 (quoting *Stevens*, 158 Wn.2d at 314 (Madsen, J., dissenting)). The intent required to prove an assault by unlawful touching is the "intent to do the physical act constituting assault." *State v. Hall*, 104 Wn. App. 56, 62, 14 P.3d 884 (2000). Therefore, to meet the factual prong of the *Workman* test, Headrick needs to demonstrate that the evidence at trial, when viewed in his favor, shows (1) he intentionally touched JL, (2) the touch was offensive, but (3) the touch did not constitute sexual contact.

Here, the evidence viewed in a light most favorable to Headrick shows that he removed JL's pants and underwear to clean and apply barrier cream to the area in close proximity to her vagina in response to apparent diarrhea symptoms, and that he may have inadvertently brushed JL's vagina in the process. The evidence also showed that neither Badger-Dye nor JL consented to Headrick touching JL in the above manner. From this evidence, a rational jury could find that Headrick's touch was intentional and offensive but did not constitute sexual contact.

The trial court reasoned that the evidence did not support a fourth degree assault instruction because Headrick testified that if he touched JL's vagina, it was inadvertent and not intentional. But Headrick also testified that he intentionally applied lotion to the area around JL's vagina, which constitutes an "intimate part" for the purpose of establishing sexual contact. *In re Welfare of Adams*, 24 Wn. App. 517, 519-21, 601 P.2d 995 (1979); RCW 9A.44.010(2). And, viewing the evidence in Headrick's favor, a reasonable jury could find that Headrick's admitted intentional touch of JL's intimate parts was for the purpose of medical treatment and

10

not for the purpose of sexual gratification. Accordingly, the trial court's reason for denying the requested fourth degree assault instruction on this ground was untenable.

The trial court also reasoned that the evidence did not support a fourth degree assault instruction because Headrick testified that he applied the barrier cream in the same manner he had applied the cream to his daughter, which was consistent with instructions provided by a pediatrician, and thus, his testimony was inconsistent with a finding that the touch was harmful or offensive. This reasoning was also untenable as the trial court appeared to focus solely on Headrick's testimony rather than all the evidence presented at trial, and it failed to recognize that a reasonable jury could find a person's touching of a child without the child's or parent's consent to be harmful or offensive even where the touching would not be offensive when applied to the person's own child.

Accordingly, the trial court abused its discretion by refusing to instruct the jury on fourth degree assault as a lesser included offense to first degree child molestation. We therefore reverse Headrick's first degree child molestation conviction and remand for a new trial.

## II. SUFFICIENCY OF THE EVIDENCE

Although we reverse Headrick's first degree child molestation conviction based on the trial court's failure to instruct the jury on the lesser included offense of fourth degree assault, we address his sufficiency of evidence claim because double jeopardy prohibits a retrial when the State presents insufficient evidence to support a conviction. *State v. Hescock*, 98 Wn. App. 600, 604-05, 989 P.2d 1251 (1999).

Headrick contends that the State failed to present sufficient evidence to support his first degree child molestation conviction. We disagree.

Our test for determining entitlement to an instruction differs from the test determining sufficiency to support a guilty verdict. Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt. *State v. Longshore*, 141 Wn.2d 414, 420-21, 5 P.3d 1256 (2000). When reviewing whether the State presented sufficient evidence in support of a conviction, we interpret all reasonable inferences from the evidence in the State's favor. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). We consider direct and circumstantial evidence as equally reliable when evaluating the sufficiency of the evidence. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004). We also "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

To convict Headrick of first degree child molestation as charged and instructed here, the State had to prove beyond a reasonable doubt that (1) on or about December 16, 2016, he had sexual contact with JL, (2) JL was less than 12 years old at the time of the sexual contact and was not married to Headrick, and (3) JL was at least 36 months younger than Headrick. RCW 9A.44.083. RCW 9A.44.010(2) defines "sexual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." The term "intimate parts" has been interpreted to have a broader connotation than sexual and to include "parts of the body in close proximity to the primary erogenous areas." *In re Adams*, 24 Wn. App. at 519-21. "Proof that an unrelated adult with no caretaking function has touched the intimate parts of a child supports the inference the touching was for the purpose of sexual gratification." *State v. Powell*, 62 Wn. App. 914, 917, 816 P.2d 86 (1991) (citing *State v.*

12

*Wilson*, 56 Wn. App. 63, 68, 782 P.2d 224 (1989); *State v. Ramirez*, 46 Wn. App. 223, 730 P.2d 98 (1986)).

Headrick challenges only the evidence supporting the element that he had sexual contact with JL. Headrick argues that because he was in a caretaking role when he made contact with JL's intimate parts, the State was required, but failed, to present evidence beyond his conduct in touching JL's intimate parts to prove sexual contact. Assuming for the sake of argument that Headrick was acting in a caretaking role when he touched JL's intimate parts, and that the State was required to present evidence beyond mere touching of intimate parts to prove sexual contact, the State met its burden here.

Viewing the evidence in a light most favorable to the State, Headrick picked up JL, carried her to his bedroom, placed her on his bed, pulled down her pants and underwear, touched JL's vagina on the "inside" with his finger, and applied lotion around her vaginal area. Headrick remained silent during this incident; he did not explain to JL why he was engaging in this conduct and did not ask JL if she was experiencing any discomfort requiring his assistance. Headrick also did not tell Badger-Dye that JL was experiencing any sickness or seek her permission to treat the sickness prior to his touching of JL's intimate parts, and he did not inform Badger-Dye that he had treated JL's sickness until she confronted him with JL's disclosure.[4] Additionally, Sanchez testified that he had overheard Headrick tell Headrick's cell mate that he

---

[4] Although Headrick points to his own testimony to support the fact that he had communicated with Badger-Dye regarding JL experiencing diarrhea, we view the evidence in a light most favorable to the State when evaluating its sufficiency to support a conviction, and here Badger-Dye testified that no such communication took place. *Longshore*, 141 Wn.2d at 420-21.

had played with a girl's genitals during a sleepover for his daughter and that he had applied cream to the girl in an attempt to cover up marks he had left on her.

We hold that this evidence was sufficient to prove that Headrick touched JL's intimate parts for the purpose of satisfying sexual desire. Accordingly, even assuming that Headrick was acting as a caregiver and, thus, the jury could not infer from his touching of JL's intimate parts alone that he acted with the purpose of satisfying sexual desire, the State presented sufficient additional evidence beyond the touching to support the jury finding that he had sexual contact with JL. Therefore, Headrick's claim that the State presented insufficient evidence to support his first degree child molestation conviction fails.

### III. SAG

Headrick raises several issues in his SAG that we do not address in light of our holding reversing his first degree child molestation conviction. One of Headrick's claims is that the trial court violated his speedy trial right. Although we generally address speedy trial claims because the remedy for such a violation is dismissal of a defendant's charge with prejudice, *see, e.g.*, *State v. Iniguez*, 167 Wn.2d 273, 282, 217 P.3d 768 (2009), we cannot address Headrick's claim.

The record on appeal does not contain any information showing when Headrick was arraigned or his custody status while awaiting trial. The record also does not contain any of the transcripts from hearings addressing motions for continuances and, thus, does not reveal the trial court's reasons for continuing his trial. *See Iniguez*, 167 Wn.2d at 283 (Holding that when determining whether a defendant's constitutional speedy trial right has been violated, courts must evaluate the reasons for the delay, as well as other factors.). Because the record is insufficient to review Headrick's speedy trial claim, we do not further address it. *See State v. McFarland*, 127

No. 50918-1-II

Wn.2d 322, 335, 899 P.2d 1251 (1995) ("If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition.").

CONCLUSION

We hold the trial court abused its discretion in declining to instruct the jury on fourth degree assault as a lesser included offense to Headrick's first degree child molestation charge. We reverse Headrick's conviction and remand for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Maxa, C.J.

Glasgow, J.

15